427 So.2d 395 (1983)
Marvin CHERNA, Appellant,
v.
Madeline CHERNA N/K/a Madeline Adamo, Appellee.
No. 82-1162.
District Court of Appeal of Florida, Fourth District.
March 9, 1983.
Howard K. Cherna of Preddy, Kutner & Hardy, P.A., Miami, for appellant.
Barry G. Roderman, Fort Lauderdale, for appellee.
GLICKSTEIN, Judge.
This is an appeal from an order enforcing the parties' post-judgment stipulation and agreement and from an order[1] subsequently correcting that order of enforcement. We affirm.
The parties entered into a property settlement agreement in 1979 which was incorporated shortly thereafter into a final judgment of dissolution. Eleven months later appellee sought relief from the final judgment, claiming fraud in the resolution of the parties' financial matters. The trial court denied her motion in February, 1981. While appellee's appeal from that order was pending, the parties entered into a stipulation and agreement. The former recited that the latter was to amend the parties' original property settlement agreement, where applicable. The latter made substantial modifications to the original agreement and expressly provided that the pending appeal was to be dismissed.
*396 When the parties tendered both documents to the trial court, it notified them by correspondence that a portion of the latter was unenforceable in that the amended provision for child support included the following sentence:
It is specifically understood and agreed that neither the Husband nor the Wife shall petition the Court in the future for an increase or decrease in child support payments above referred to.
On receipt of the correspondence, appellee's counsel moved for enforcement of the instruments with the above language deleted. Five months later, appellant served a memorandum of law in opposition to the motion, contending the above sentence was not divisible; and that the court lacked jurisdiction to entertain appellee's enforcement motion because Florida Rule of Civil Procedure 1.540(b) required that it be filed within one year after entry of the final judgment. In this appeal, the former husband again argues that the trial court lacked jurisdiction, but he now adds that the trial court should have conducted an evidentiary hearing upon the issue of whether the subject sentence was divisible in nature.
The sentence was not only divisible, it was superfluous. We are reminded by this case that creative judicial administrators are working on two fronts: 1) keeping within the judicial arena those matters which properly belong there; and 2) trying to find legitimate ways to rid the system of unnecessary and often frivolous but expensive litigation which a) clutter the court houses of this nation so badly as to waste the limited resources available from taxation, b) impair judicial efficiency, and c) threaten greater harm.[2]
*397 The welfare of children lies within the first category. Accordingly, the court house door is always open for the consideration of the care and maintenance of children. Thus, the legislature has codified such primary judicial responsibility by the enactment of section 61.13, Florida Statutes (1981), which provides, in part:
The court initially entering an order requiring one or both parents to make child support payments shall have continuing jurisdiction after the entry of such initial order to modify the amount of the child support payments, or the terms thereof, when such is found to be necessary by the court for the best interests of the child or children, when the child or any one of the children has reached the age of 18 years, or when such is found to be necessary by the court because there has been a substantial change in the circumstances of the parties.
Accordingly, we find that the contention that the trial court was without jurisdiction to consider the post-judgment motion because it was submitted more than one year after entry of the final judgment is without merit,[3] not only because of the foregoing statute but also because an agreement between spouses respecting the care and maintenance of children cannot bind the court, which must insure provisions for those fundamental needs.[4]
*398 Appellant apparently would use the subject sentence, which was so improvidently included in the agreement, as a whipsaw to rebargain his agreement. There are at least three reasons why the trial court properly did not provide him such opportunity. First, children are not pawns in their parents' financial squabblings; and the provision for the children's care and maintenance should be considered without concern for such matters. Appellant has provided nothing in his appendices to establish that, in opposition to appellee's motion, he called to the trial court's attention any allegation that the modification with respect to the children's care and maintenance was excessive, inappropriate or otherwise unjust. Second, it is apparent that appellee dismissed her appeal to this court based on her execution of the agreement. Third, the court house door is open to appellant to show any material change in circumstances which would entitle him to relief from the provisions in the agreement.
WALDEN, J., concurs.
HERSEY, J., concurs in result only.
NOTES
[1] Although this court earlier considered the appeal as interlocutory pursuant to Florida Rule of Appellate Procedure 9.130, the order is post-judgment. The motion which precipitated the order represents the only judicial labor involving the trial court, and the proceeding should have been conducted by the parties as a plenary appeal. We now do so and the appendices shall serve as the record.
[2] In a recent speech, Judge Irving Kaufman, judge of the Second Circuit Court of Appeals, as well as executive committee chairman and past president of the Institute of Judicial Administration recently said the following:

The time has come when an unforeseen force is threatening to erode the ability of judges to fulfill their constitutional mandate. Although judges have, in general, resisted political pressures and other influences, they are now faced with a different obstacle  a virtual tidal wave of litigation.
....
Skyrocketing caseloads are stretching courts beyond their limits. In the federal district court alone, over 228,000 cases were filed between June 30, 1981, and June 30, 1982, an increase of nearly 40 per cent in only five years that a judge must decide. In human terms, this translates into an annual caseload approaching 450 cases per judge  more than one case every day. I ask how it is possible to keep this system from faltering under such conditions.
... .
... The people of the United States have surely become the most litigious on earth. Consider, for example, that in 1980 more than 5 million civil suits were filed in federal and state courts. By contrast, in 1979, Japan, a nation with a population one-half that of the United States, and a comparably sophisticated industrial society likely to generate disputes, disagreements and injuries, had only 160,000 such suits.
Nor does this trend show any signs of abatement. From the beginning of World War II through 1981, civil case filings in federal courts grew nearly six times faster than the population of the entire country. At the state court level, trial court filings have increased twice as fast as the population.
Americans are also showing a remarkable ingenuity in fashioning claims for judicial resolution. My close friend, former federal Judge Simon Rifkind, stated it succinctly: "The American public today perceives courts as jack-of-all-trades, available to furnish the answer to whatever may trouble us." A brief consideration of several recent lawsuits highlights the truth of this observation:
[*] In 1977, a group of angry Washington Redskins football fans filed suit in federal court to overturn a referee's call that resulted in a victory for the St. Louis Cardinals.
[*] Clergymen are forced to take out malpractice insurance to protect themselves against accusations they are not properly fulfilling their pastoral role  a function one would have thought susceptible to human frailty but not open to courtroom attack. I had always believed that ministers, priests and rabbis answered to a different "higher authority."
[*] A 41-year-old California man (and perhaps this particular example could have emerged only from California), upset at a woman who failed to keep a date with him, sued his would-be companion for $38 to compensate him for preparing for their evening together, and driving 40 miles for nothing.
Clearly, little remains sacred. Suffice it to say that most, if not all, of these cases would have been inconceivable just 20 or 30 years ago. These examples provide some entertainment in the telling, but they also make the point that too many cases, by no means all of them involving such creative theories, are brought in our courts.
....
In civil disputes, we must begin to re-examine whether the benefits of full-scale jury trials justify the costs. A recent study by the Rand Corp. indicates the average cost of a jury trial is roughly $8,000 per case. That same study reveals that in one typical major urban jurisdiction the amount recovered was less than $8,000 in approximately 75 per cent of civil trials. Surely we cannot continue blindly to accept such anomalous results.
....
Novel judicial procedures are needed to address these serious concerns. As other countries have been doing for years, we can begin to experiment with specialized courts to remove certain highly technical issues from lay jurors. However, real solutions will come only as citizens discover new means of resolving disputes without judicial intervention.
....
Some encouraging statistics are already in. The American Arbitration Association reports an increase in arbitrations from 1975 to 1981 of approximately 22.5 per cent. In California, which has the greatest number of superior courts in the country, civil disputes involving $15,000 or less are subject to mandatory, although non-binding, arbitration. Also, since 1978 three federal districts have been experimenting with a system of compulsory arbitration for civil cases involving claims of less than $50,000 damages. Additionally, California litigants have invoked a dusty and seldom-used "rent-a-judge" law to bypass the state's overcrowded court system. Parties agree to hire their own judge, usually a retired jurist, to resolve their dispute.
The business community is also attempting to avoid the costs of prolonged litigation. As a former IBM chairman described the problem: "My lawyers have an unlimited budget and every year they exceed it." Seeking a solution, 103 major companies have joined the three-year-old Center for Public Resources, Inc. The New York-based foundation established a "judicial" panel, made up of lawyers and non-lawyers who attempt to settle inter-corporate disputes.
Out-of-court arbitration is, of course, available to individuals as well as to corporations. Other, even less formal methods of dispute resolution have also proved successful and have demonstrated the creativity that may be brought to small-scale disagreements. For example, New York City's Jewish Conciliation Board, in existence since 1920, dealt with more than 1,300 cases in 1981, employing a panel not of three judges but of volunteers: one lawyer, one rabbi and one lay person. The Christian Conciliation Service, a similar group, assists in arbitrating disputes in which conciliators consider a range of solutions including "love" and "forgiveness." Novel dispute resolution methods like these can help us to begin slaying the twin dragons of cost and delay, now menacing our courts.
The difficulties created by prolonged civil litigation can begin to be addressed with new techniques for resolving disputes.
The Miami Herald, Feb. 13, 1983, at 1E, cols. 1-3, & 4E, cols. 1-3 & 6 (emphasis original).
[3] Appellant, while relying upon Florida Rule of Civil Procedure 1.540(b), does not explain how the parties could place before the trial court within one year of the final judgment a motion to enforce a post-judgment agreement executed almost two years after entry of the final judgment.
[4] See Frazier v. Frazier, 109 Fla. 164, 147 So. 464 (1933); Eaton v. Eaton, 238 So.2d 166 (Fla. 4th DCA 1970); and Viltz v. Viltz, 384 So.2d 1348 (Fla. 3d DCA 1980).